HILL v. FROEHLICK et al.

(Supreme Court, General Term, Third Department. May 21, 1891.)

WITNESS—IMPEACHMENT—CONTRADICTORY STATEMENTS.
    Where a party on cross-examination interrogates a witness as to matter concerning which the witness did not testify in chief, such party makes the testimony so elicited part of his own case, and cannot afterwards show that the witness had made statements in conflict therewith.

Appeal from circuit court, Albany county.

Action by Margaret Hill against Frank Froehlick and Peter Mourion, as executors of Mary Young, deceased. Judgment was entered on a verdict for plaintiff, and defendants appeal.

Argued before LEARNED, P. J., and LANDON and MAYHAM, JJ.

*E. J. Meegan,* for appellants. *R. Countryman,* for respondent.

LANDON, J.　The question in issue was whether Mary Young, the mother of the plaintiff, during her last illness, and shortly before her death, gave to the plaintiff a savings bank book, and the right to the deposits of which the book afforded the evidence. Mary Young was about 80 years of age, and died leaving four children surviving her. She left an estate valued at about $4,700, in addition to about $1,900 represented by the savings bank book in question. About three and one-half years before her death she executed her last will and testament, by which she gave a legacy of $400 to a grand-daughter, and the remainder to her four children, share and share alike. She had long resided with her son Joseph Young in Albany. The plaintiff resided within 200 feet of Joseph. Mary Young, being unwell, on Sunday before her death went to the plaintiff's house, and remained there until her death on the following Friday. The plaintiff's case rests mainly upon the testimony of Magaret Burke, who testified that Mary Young, while lying in bed in the plaintiff's house, on Monday of the week of her death, called the plaintiff to her bedside and handed her the bank-book, at the same time saying: "Here, Margaret, take it, and keep it. I always intended it should be yours;" and the plaintiff took the book and kept it. Upon being recalled at a later stage of the case, Mrs. Burke further testified that in July, four months prior to her death, Mary Young told her that she had between eighteen and nineteen hundred dollars in the bank, and said: "When I am dead I will give it to my daughter Margaret, because she is a good woman." The plaintiff produced the bank-book, and testified that she had had possession of it since the Monday previous to Mrs. Young's death. This testimony, if true, would justify the verdict. *Penfield* v. *Thayer,* 2 E. D. Smith, 306. We do not think it was necessary, in order to complete the delivery, for the donor to give the donee a check or order upon the bank for the amount due. But the testimony on the part of the defendants tended strongly to discredit the case made by the plaintiff, and we shall set it forth in some detail, in order to show the more clearly the probability that the verdict was influenced by the incompetent testimony which we shall afterwards consider. The two defendants and their counsel testified that at the time the inventory of the estate of the testatrix was taken the plaintiff stated that she had the bank-book, and said that her mother gave it to her on Monday before her death, but that she did not get it until Thursday. Joseph Young, the son of testatrix, testified that the plaintiff also said on the same occasion that she went over to his, Joseph's, house on Thursday, and got the book. Margaret Young, a daughter-in-law of the testatrix, testified that while visiting her on Thursday before her death the plaintiff said to her mother, "Mother, where have you got your bank-book?" and the testatrix replied, "You go and look for it, and you will find it." She also testified that shortly after Mary Young's death the witness and the plaintiff went to Joseph Young's house, and the plaintiff then said, "Now we are here, we will look for the bank-book," and after looking in her trunk and other places the plaintiff said, "I wonder where mother has her bank-book, if she hain't left it down to Mrs. Snyder's." Mrs. Maas also testified that on the Thursday before Mary Young's death she heard the plaintiff say to her mother: "Mother, where have you got your bank-book? I looked for it, and could not find it." To which her mother replied: "You don't need to look for it; you can't find it." Mrs. Mourion testified that during Mary Young's illness the witness asked the plaintiff why she did

not ask her mother about the bank-book, to which plaintiff replied: "I just asked her. She says, 'What do you want of the bank-book? You can't find it. You can't have it.'" The plaintiff contradicted all these witnesses except Margaret Young as to her declarations at Joseph's house after Mary Young's death. In this precarious condition of the plaintiff's case upon the merits it is obvious that slight circumstances might influence the verdict. The defendants had examined Joseph Young to the effect already indicated, and the plaintiff, by his cross-examination, sought to show that immediately before his mother left his house and went to the plaintiff's his wife had ill-treated her. The witness testified on cross-examination: "My wife did not on any occasion chase mother with a knife just prior to her death, or at any other time. I never told Anna Harper that in my kitchen." The plaintiff then called Anna Harper, and defendants' objections that the matter was collateral, and the plaintiff was bound by his answer, being overruled, she testified in response to plaintiff's questions: "Yes, sir, he was in the kitchen, and his wife was there, and he said she had run after the old lady, and if he didn't shut up his mouth she would have went for him, and he run out the back gate." We think Anna Harper's testimony was inadmissible. Plaintiff's counsel by his examination made Joseph Young his own witness upon the new subject of his mother's relations with his wife. If upon his direct examination Joseph Young had given the testimony in respect to the relations of his wife and mother, then it would have been proper upon the cross-examination to ask him as to his contradictory declarations out of court, and if he denied or said he did not remember, then to prove them by the witness who heard them. But as he did not testify respecting such relations upon his direct examination, the plaintiff, by asking him about them on cross-examination, made his testimony upon that subject a part of her own case; and although she could contradict him by testimony that the fact was otherwise, she could not do it by testimony that Joseph had said out of court that the fact was otherwise. The plaintiff might prove the fact itself, but not the witnesses' unsworn narrative of the fact. It is a general rule that a witness may be impeached by proving that his statements out of court contradict his testimony. But such contradiction must be of his testimony in chief, or of such parts of his testimony on cross-examination as are pertinent to his testimony in chief; otherwise the testimony of the witness as to the subjects for which he was vouched for by the party calling him is not discredited in fact, but the jury are led to suppose it is, and are misled by the hearsay evidence, which is given under the guise of the impeachment. *People* v. *Cox,* 21 Hun, 47, affirmed 83 N. Y. 610. The judgment should be reversed, new trial granted, costs to abide the event. All concur.